**BOWLES, Price Administrator, v. MANNIE & CO. et al.**

No. 8857.

Circuit Court of Appeals, Seventh Circuit.

March 13, 1946.

Rehearing Denied April 22, 1946.

130

Stanford Clinton and Nicholas J. Pritzker, both of Chicago, Ill., for defendants-appellants.

David London and Nathan Siegel, both of Washington, D. C., Amos J. Coffman, George E. Leonard, and Katherine H. Johnson, all of Chicago, Ill., George Moncharsh, Deputy Administrator for Enforcement, and Milton Klein, Director, Litigation Division, Office of Price Administration, both of Washington, D. C., and George E. Leonard, Regional Litigation Atty., Office of Price Administration, of Chicago, Ill., for defendants-appellees.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Defendants appeal from a decree granting an injunction on the second count of a complaint filed by plaintiff under the Emergency Price Control Act[1] directing compliance with the record-keeping and invoicing requirements of the regulations involved and enjoining defendants from selling cotton textiles at prices in excess of the applicable maximum prices adopted by the Price Administrator.

The complaint alleged that defendants had engaged in acts and practices in violation of certain regulations promulgated and made effective pursuant to the terms and provisions of the Act. The regulations asserted as applying are Revised Price Schedule 35 issued October 21, 1941, 6 Fed.Reg. 5335; Revised Price Schedule 89 issued May 4, 1942, 7 Fed.Reg. 715; Maximum Price Regulation 118 issued May 4, 1942, 7 Fed.Reg. 3038; Maximum Price Regulation 127 issued May 4, 1942, 7 Fed. Reg. 3119; and the General Maximum Price Regulation,[2] 7 Fed.Reg. 3153 (hereinafter referred to as RPS35, RPS89,

[1] Emergency Price Act of 1942, 56 Stat. 23, as amended, 50 U.S.C.A.Appendix § 925(a), 58 Stat. 640, provides: "Whenever in the judgment of the Administrator any person has engaged * * * in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act (section 904 of this Appendix), he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged * * * in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond."

Sec. 4(a), 50 U.S.C.A.Appendix § 904(a), 56 Stat. 28, provides in part: "It shall be unlawful, * * * to sell or deliver any commodity, * * * in violation of any regulation or order under section 2 * * *."

[2] General Maximum Price Regulation, 7 F.R. 3153 et seq. as amended, provides: (§ 1499.11) "Base period records. Every person selling commodities or services for which, upon sale by that person, maximum prices are established by this General Maximum Price Regulation shall:

"(a) Preserve for examination by the

MPR118, MPR127, and GMPR). Defendants concede that GMPR applies to the commodities handled by them where no other specific regulation controls.

Before the effective dates of these regulations inflationary pressures were already so great that official cognizance was taken of them. By executive order No. 8734, issued April 11, 1941, which established the Office of Price Administration and Civilian Supply, the Administrator was authorized to take lawful steps necessary to prevent price spiraling, rising costs of living, profiteering and inflation.

Section 1316.51(b) of RPS35, section 1316.101(b) of RPS89, and section 1400.-104 of MPR118 fix the prices at which any person may sell blue denim, bed linens and unbleached duck, respectively, at the mill price, except when such commodities are sold by a person performing "a recognized distributive function," but they are not applicable to sales or delivery of the commodity made to any wholesaler, jobber or retailer "in the performance of a recognized distributive function." Section 1400.-82(i)(1) of MPR127 provides for a jobber's markup on finished piece goods sold in the performance of a recognized distributive function to be computed under a certain formula stated therein, and that no sale is made in the performance of a recognized distributive function within the meaning of the regulation unless it advances the goods sold to the next stage of distribution. The phrase "in the performance of a recognized distributive function" is not defined in either RPS35 or RPS89. Both MPR118 and MPR127 provide that "no sale is made in the performance of a recognized distributive function unless it advances the goods to the next stage of distribution, but no explanation or definition is given as to what constitutes the "next stage of distribution." However, MPR118, § 1400.104, declares that "Presumptively sales by one jobber to another, or by one manufacturer to another, engaged in the same type of business, are not sales in the perfomance of a recognized distributive function."

*The facts:* Both Mercantile Trading Company, a partnership in existence for about ten years prior to 1941 consisting of Meyer Fefferman, Manuel Fefferman and Rose Fefferman, and Mannie & Company, a corporation formed in 1941, were engaged in the purchase and sale of cotton textiles. Etta Fefferman was the principal owner of the capital stock of Mannie & Company, and Manuel Fefferman, her husband, looked after her interests in that corporation. Mercantile had an office and warehouse on Michigan Avenue in Chicago, where its stock was kept and from which shipments were made. It sold its merchandise to the public generally—to "anybody who came in to buy." Mannie had an office on La Salle Street in Chicago, where it employed one person. There samples were carried, and orders by mail, telephone, or in person were received from anyone desiring to buy its merchandise. Mannie purchased ninety-five percent of its merchandise from Mercantile, who filled and shipped the orders received by Mannie. Mannie invoiced its customers on its own letterheads, but as Mannie received payments by checks, it assigned them to Mercantile. Among Mannie's customers was Texcott & Company, a jobber, which sold to public and private institutions.

---

Office of Price Administration all his existing *records* relating to the prices which he charged for such of those commodities or services as he delivered or supplied during March 1942, and his offering prices for delivery or supply of such commodities or services during such month; and

"(b) Prepare, on or before July 1, 1942, on the basis of all available information and records, and thereafter keep for examination by any person during ordinary business hours, a statement showing:

"(1) The highest prices which he charged for such of those commodities or services as he delivered or supplied during March 1942 and his offering prices for delivery or supply of such commodities or services during such month, together with an appropriate description or identification of each such commodity or service; and

"(2) All his customary allowances, discounts, and other price differentials. * * *"

(§ 1499.12) "Current records. Every person selling commodities * * * for which, upon sale by that person, maximum prices are established by this * * Regulation, shall keep, and make available for examination by the Office of Price Administration, records of the same kind as he has customarily kept, relating to the prices which he charged for such of those commodities * * * as he sold after the effective date of this * * * Regulation; and, in addition, records showing, as precisely as possible, the basis upon which he determined maximum prices for those commodities or services."

In February, 1944, the Office of Price Administration examined defendants' records to determine whether defendants were selling their merchandise at prices in excess of the applicable maximum prices adopted by the Price Administrator. The investigation disclosed that in September, 1943, Mercantile had purchased 5,602 yards of blue denim at 21½ cents per yard, which it sold to Mannie at 23½ cents per yard, and that Mannie in turn sold it to Texcott at 25½ cents per yard; that Mercantile sold to Mannie 1,070 yards of unbleached duck at 39½ cents a yard, which Mannie sold to Texcott at 42 cents a yard; that in November, 1943, Mercantile sold to Mannie 1,025 yards of bleached duck at 44.8 cents a yard, which Mannie sold to Texcott at 46 cents a yard; and that in December, 1943, Mercantile had purchased 5,050 yards of 42-inch bleached sheeting at 25 cents a yard, which it sold to Mannie at 32½ cents a yard, and that Mannie sold some of this sheeting to Texcott at 34½ cents a yard.

The testimony of experts tended to show that before a sale of cotton textiles can be said to be made in the performance of a recognized distributive function, the goods must be advanced to the next stage of distribution, and that the recognized stages of distribution are producer, wholesaler or jobber, retailer or commercial user and consumer, and that sales from one individual in a given stage or level to another in the same stage or level do not advance the goods to the next stage of distribution.

Thus, upon substantial evidence the court found that the maximum prices for sales by Mercantile to Mannie and by Mannie to Texcott of cotton goods, bed linens and cotton products, respectively, are fixed and determined by RPS35, RPS89 and MPR 118, respectively; that the maximum prices for sales by Mercantile to Mannie and by Mannie to Texcott of finished piece goods are fixed and determined by MPR127; that the maximum prices for sales of cotton goods, bed linens and cotton products by Mercantile to Mannie and by Mannie to Texcott, when made in the performance of a recognized distributive function, are fixed and established by the provisions of GMPR; that defendants and Texcott were engaged in business as jobbers or wholesalers of cotton textiles; and that the sales by Mercantile to Mannie and by Mannie to Texcott of cotton goods, bed linens, cotton products and finished piece goods were not sales in the performance of a recognized distributive function.

Upon these findings of fact the court concluded that Mercantile, in its sales of cotton textiles to Mannie, and Mannie, in its sales to Texcott, have each violated the record-keeping and invoicing requirements of RPS35, RPS89 and MPR118; that Mercantile and Mannie on their sales of finished piece goods have violated the invoicing and record-keeping requirements of MPR127; that Mercantile and Mannie have each violated the provisions of §§ 1499.11 and 1499.12 of GMPR in that neither has adequate and correct base period statements as required by § 1499.11, and neither has kept records showing as precisely as possible the manner in which it computed its maximum prices as required by § 1499.12 of GMPR; that Mercantile, in its sales to Mannie, and Mannie, in its sales to Texcott, have each violated the provisions of RPS35, RPS89, MPR118, and MPR127 by selling and delivering cotton goods, bed linens, cotton products and finished piece goods, respectively, at prices higher than the maximum prices fixed and determined therefor by RPS35, RPS89, MPR118, and MPR127; and that Mercantile and Mannie have each violated the provisions of GMPR by selling and delivering cotton goods, bed linens and cotton products at prices in excess of the maximum prices fixed and determined therefor by the GMPR.

In their briefs and upon oral argument defendants stated that the errors relied on are concerned with the application of the Act and with the construction and applicability of the regulations involved.

■ A plain reading of § 1(a) of the Act, 50 U.S.C.A.Appendix § 901(a), clearly discloses that one of the purposes of the Act was to prevent, in the interest of the national defense and security, unwarranted increases in prices. In reporting on the bill, the Senate Committee said: "In order to achieve effective price control it may often be necessary to regulate or prohibit practices which are * * * likely to result in * * * increases inconsistent with the purposes of the bill. * * * Examples of such practices in connection with a commodity include * * * the unnecessary multiplication of middlemen, * * * or manipulative selling * * * practices." Sen.Rept.No. 931, 77th Cong. 2d Sess. p. 17. In Bowles v. Wheeler, 9

Cir., 152 F.2d 34, 37, the court said: "With respect to the regulations issued pursuant to the broad powers granted the Price Administrator to issue 'such regulations and orders as he may deem necessary or proper in order to carry out the purposes and provisions of this Act' * * * we find conclusive evidence of the clear intent of Congress to make anti-inflation controls as effective as legislative ingenuity could devise."

*First*: Defendants argue that to sustain the District Court's interpretation of the regulations would disrupt their established manner of doing business in violation of § 2(h), 50 U.S.C.A.Appendix § 902(h), of the Act. That section of the Act provides: "The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, * * * except where such action is affirmatively found by the Administrator to be necessary to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act."

The law is now well established that the validity of the regulations is a matter which lies within the exclusive jurisdiction of the Emergency Court of Appeals, and we must accept them as valid, as least before their validity has been adjudicated by recourse to the protest procedure prescribed by the statute. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Henderson v. Burd, 2 Cir., 133 F.2d 515, 517, 146 A.L.R. 714; Philadelphia Coke Co. v. Bowles, Em.App., 139 F.2d 349; United States v. Pepper Bros., 3 Cir., 142 F.2d 340; and Crawford & Doherty Foundry Co. v. Bowles, Em. App., 146 F.2d 861.

In their briefs defendants say that they are not questioning the validity of the regulations. They say the vital issue is whether or not the sales of cotton textiles from Mercantile to Mannie and from Mannie to Texcott were in the performance of a recognized distributive function, but to hold that the sales were not in the performance of a recognized distributive function would deprive them of a wholesaler's markup; hence they claim the court's interpretation of the regulations was unreasonable.

They argue that the markup which is permitted to wholesalers by § 1400.82(i)

(1) is followed by § 1400.82(i) (2) of MPR127 which specifically lists certain wholesale transactions to which the markup does not apply, but does not include in this list wholesaler to wholesaler transactions, thus MPR118 and MPR127 specifically contemplate and recognize that jobber to jobber transactions can be in the performance of a recognized distributive function in that they advance the goods to the next stage of distribution.

After the promulgation of the regulations here involved, the Administrator issued interpretations of the regulations in which he defined the term "in the performance of a recognized distributive function." He stated that "Sales by one wholesaler or jobber are, presumptively, not sales in the performance of a recognized distributive function, since the sale will not carry the goods forward to the next stage in the distributive process." Thus, the question we are asked to decide involves an interpretation of an administrative regulation.

In the case of Bowles v. Simon, 7 Cir., 145 F.2d 334, 337, this court said: "We do not accept the Administrator's view that he may promulgate a regulation and then place on it an interpretation which becomes controlling on the courts. The Administrator has not grown to any such stature. The courts may consider his interpretations and follow them, if correct, but the court is not bound to follow them." Be that as it may, we must, however, be mindful of the admonition of the courts that the construction given to a statute [regulation] by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons, United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588, and that the administrative interpretation is of controlling weight unless plainly erroneous or inconsistent with the regulation. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215.

The Administrator's interpretation is not inconsistent with the regulation, neither can we say that the interpretation is erroneous, and since Mercantile, a wholesaler or jobber, sold to Mannie, also a wholesaler or jobber, and Mannie sold to Texcott, the court, in the situation thus appearing, was justified in holding that each transaction was a duplicate or suc-

cessive sale at the same level or stage in the distributive process, and that it was not a sale at the next stage of the distributive process.

*Second*: Defendant Mannie challenges the court's finding that Texcott was a wholesaler. It calls attention to §§ 1499.-20(o) and (p) of GMPR, as amended, 7 Fed.Reg. 4660 [3]. It contends that sales by Texcott to private and public institutions constitute sales at retail because an institution is an ultimate consumer and not an industrial or commercial user.

■ We think it reasonable to assume that when Texcott sold the cotton textiles to private and public institutions, the customers purchased the goods to use them as supplies or equipment in their business; hence, in answer to Mannie's contention, we believe it will be enough to say that even if an institution may be considered an ultimate consumer, it will not be precluded from being a commercial user. Bowles v. Seminole Rock & Sand Co., 5 Cir., 145 F.2d 482; Speten v. Bowles, 8 Cir., 146 F.2d 602; and Bowles v. Rogers, 7 Cir., 149 F.2d 1010. We are fortified in this belief by what was said in Roland Electrical Co. v. Walling, 66 S.Ct. 413, 421. True, that case did not involve the Price Control Act. It involved the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., yet the court had occasion to discuss what was meant by wholesale. It said: "wholesaling is said to cover sales 'to * * * an industrial consumer so long as the purpose of the customer in buying such goods is to * * * use them for business needs as supplies or equipment.'" Consequently, since the institutions to whom Texcott sold the textiles used them as supplies or equipment in their business, we cannot say that the conclusion of the court that Texcott was a wholesaler was wrong.

■ Defendants also make the point that there is no showing that the sales from Mercantile to Mannie and from Mannie to Texcott resulted in a single penny excess charge to the consumer.

The record discloses that the complaint in this case was in two counts. The first count was for statutory damages for alleged violations of RPS35 and 89, MPR118 and 127, and GMPR, pursuant to § 205(e) of the Act, 50 U.S.C.A.Appendix § 925(e). In the District Court the parties stipulated for the entry of an order continuing the question of damages until a final adjudication shall be had upon the equitable issues set forth in the second count. Under such circumstances, we agree with plaintiff that whether or not the sales resulted in an overcharge must await the determination of the equitable issues set forth in the second count of the complaint.

Finally defendants contend that it was an abuse of discretion for the court to issue the injunction.

The alleged errors assigned are: (1) As to RPS35 and 89 and MPR118, they say their sales were made in the performance of a recognized distributive function; (2) that because they believed they were covered by GMPR, they, in good faith, failed to comply with the record-keeping and invoicing requirements of MPR127; and (3) that Mercantile was misled by plaintiff's investigators into believing it was not subject to MPR127.

■ We have already ruled on the first point. As to the second point, they argue that until the investigation which resulted in this proceeding they mistakenly assumed and believed that the prices for bleached duck were fixed by GMPR. A somewhat similar contention was made in the case of Bowles v. 870 Seventh Avenue Corporation, 2 Cir., 150 F.2d 819, 823. In that case defendant attempted to excuse its conduct by the large number of items on its menus and frequency in the change of its employees which resulted in an inexperienced staff

---

3 § 1499.20(o). This section is as follows: "'Sale at retail' or 'selling at retail' means a sale or selling to an ultimate consumer other than an industrial or commercial user except that * * * (2) for the purpose of Section 1499.11 and 1499.13 of this General Maximum Price Regulation a sale at retail shall not include any sale to the United States, any other government or any of its political subdivisions, any religious, educational or charitable institution, any institution for the sick, deaf, blind, disabled, aged or insane, or any school, hospital, library, or any agency of any of the foregoing."

§ 1499.20(p). "'Sale at wholesale' means a sale by a person who buys a commodity and resells it, without substantially changing its form, to any person other than the ultimate consumer, except that, for the purposes of Section 1499.3 of this General Maximum Price Regulation, a sale at wholesale shall include any sale by such person to an industrial or commercial user."

and so forth. The court held the excuse was insufficient and said: "The defendant had no right to ignore the law until its negligent violations were called to its attention." We agree.

■ As to the third point, defendants argue that if a defendant is advised to keep records in a certain way, the issuance of an injunction is not proper or necessary to restrain him from doing the very thing plaintiff's employees advised him to do, unless the evidence discloses an unwillingness on the part of the defendant to comply with the proper regulation when requested to do so. However that may be, it will suffice to say that the Administrator can not be bound by various oral interpretations which happen to be made by his hundreds, perhaps thousands, of employees. Bowles v. Indianapolis Glove Co., 7 Cir., 150 F.2d 597, 601, certiorari denied 66 S.Ct. 484.

Defendants also question the propriety of the injunction in so far as GMPR is concerned because, it is said, the complaint failed to allege a violation in that respect.

■ It is true the complaint did not charge Mercantile with the violation of GMPR. Over the objection of defendants, but two months after the taking of evidence had been concluded, plaintiff was permitted to amend the complaint charging Mercantile with the violation of GMPR. We perceive no error in this regard, since Rule 15(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, authorizes amendments to conform to the evidence "at any time, even after judgment."

It is also contended that the record does not disclose that Mercantile failed to keep adequate and correct base-period statements or records which showed as precisely as possible the manner in which it computed its maximum prices as required by §§ 1499.11 and 1499.12.

■ In the consideration of this contention, we note that the defendants make no claim that they were not, in March, 1942, selling a variety of textiles which were subject to GMPR, and the record discloses that Meyer Fefferman, who did all the buying and selling for Mercantile, testified: "Q. Did you prepare a base period statement as required, the base period for GMPR? A. I don't know what that means." He also testified: "I am not familiar with any of the GMPR," "I never knew any regulations of GMPR at all," and

that he established his March, 1942, ceiling prices by his cost plus his traditional mark-up.

As to Mannie, the record discloses that Manuel Fefferman testified that Mannie established its maximum price under GMPR in the same method as Mercantile established its maximum. Under this state of the record we cannot say the court abused its discretion. Hecht Co. v. Bowles, 312 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754; Bowles v. Lentin, 7 Cir., 151 F.2d 615; and Bowles v. Leithold, 3 Cir., 155 F.2d 124.

The decree of the District Court will be affirmed. It is so ordered.