**CINCINNATI GASKET, PACKING & MFG., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17818.**

United States Court of Appeals
Sixth Circuit.

June 5, 1968.

---

J. Mack Swigert, Cincinnati, Ohio, John R. Phillips, Cincinnati, Ohio, on brief, for petitioner.

Burton R. Raimi, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allison W. Brown, Jr., Harold B. Zanoff, Attorneys, N. L. R. B., Washington, D. C., on brief, for respondent.

Before COMBS, Circuit Judge, and McALLISTER and CECIL, Senior Circuit Judges.

CECIL, Senior Circuit Judge.

This cause is before the Court upon petition of Cincinnati Gasket, Packing & Mfg., Inc., to review and set aside an order issued on March 31, 1967, against it by National Labor Relations Board, the respondent herein. Section 160(f), Title 29, U.S.C. The Board cross-petitions for enforcement of its order. Jurisdiction of the Board and this Court is not in dispute. The Board determined that the petitioner committed unfair labor practices in violation of Section 158(a)

(1) and (5), Title 29, U.S.C. The Board's decision and order are reported at 163 NLRB 104. The petitioner is engaged in the manufacture of gaskets and industrial glass in Cincinnati, Ohio.

On August 6, 1963, as a result of an election conducted by the Board on May 2, 1963, the Board certified that International Association of Machinists, District No. 34 (IAM) was the exclusive collective bargaining representative for the petitioner's production and maintenance employees. A collective bargaining agreement was entered into between IAM and the petitioner effective April 16, 1964, and expiring by its terms on October 7, 1964. Subsequently by petition of certain employees and an election conducted by the Board IAM was decertified and the petitioner was so notified on September 3, 1964.

On August 28, 1964, after the opening of a new plant in Reading, Ohio, Mr. Albert J. Uhlenbrock called a meeting of all the employees, including office employees and supervisors. Mr. Uhlenbrock discussed the facilities of the new plant and suggested that if a committee were appointed management could have a closer communication with the employees. Mr. Uhlenbrock offered assistance in hiring and paying for legal services which the employees might need for their committee. On October 6th, at a meeting of some forty-five employees, Joe Hopkins, Bill Fisher and James Swinford were elected as committeemen and Eugene Aday was elected as an alternate committeeman. The Committee met with Mr. Uhlenbrock and executives Charles Eldred and Paul Torbeck on October 8, 1964. Uhlenbrock told the committee that they could present employees' questions to the employer's officials, acting as a "communications link between management and the general employees." At this meeting the committee said the employees wanted radios in the shop, job posting and company-financed group insurance. Uhlenbrock said he would answer their questions at the next meeting.

Uhlenbrock told members of the committee at a meeting on October 28, 1964, that general wage increases and merit increases would not be discussed with the committee. He also said that new job classification and wage rates would be established by him with the help of Mr. Torbeck, the company accountant. At this meeting Uhlenbrock told them that vending machine profits would be put into an account for all employees and he refused to consider an employee as a trustee to help administer the employer's profit sharing plan.

Regular monthly meetings were held between management and the committee during November and December. These meetings were more in the nature of a forum in which the employees asked questions about working conditions and management replied, rather than negotiations or collective bargaining. The employer made announcements relative to the new insurance plan, Christmas bonus and perfect attendance awards. A question was asked with reference to profit sharing benefits of a discharged employee.

On January 12, 1965, the employees refused to work and gathered in the cafeteria in protest against the demotion of one Henry Swinford, father of three of the employees. When Mr. Uhlenbrock entered the cafeteria Richard Swinford said that his father should not have been demoted. Uhlenbrock explained the reasons for the demotion and apparently the meeting broke up and the men went back to work. The meeting was not called by the shop committee and there were no negotiations between management and employees. It was at this meeting that Uhlenbrock made the statement, relied upon so heavily by the Board, that he recognized the committee as the bargaining agent of the employees.

Subsequent to the cafeteria meeting, Fisher, Hopkins and James Swinford retained attorney Francis Simlar to draft a contract and by-laws for the committee. At the February monthly meeting members of the committee told Uhlen-

brock that they were registered as a shop union. Uhlenbrock asked for a written notice which was never provided. At the May meeting the committee told Uhlenbrock that their attorney was preparing a written contract. Uhlenbrock said that he would not discuss a contract until he received "official notice" from the committee's attorney and that he wanted to have his attorney go over it to see if it was okay.

On July 13, 1965, a newly elected committee, consisting of James Dwire, Bob Huddleston and Dan Nowlin, along with James Swinford, met with Uhlenbrock, Eldred and Torbeck of management. At this time a fourteen-page contract was presented to management, providing for recognition, union security, and naming the union as "Maintenance and Production Workers Union of Cincinnati Gasket, Packing and Manufacturing, Inc." Management was given nine days to respond and another meeting was held on July 21st. At this time Uhlenbrock said that he had given the contract to his attorney and that he could not sign until he had approval from his attorney.

After this meeting members of the committee decided that they needed outside help. Aday, Dwire and Swinford went to the IAM hall and met with Arnold Tucker, President of District Lodge No. 34. Tucker agreed to assist the committee if the employees would "affiliate" with IAM. At a meeting of employees, on July 21st, they purportedly "affiliated" with IAM. All of the employees who attended this meeting signed cards authorizing the International Association of Machinists to act as their collective bargaining agent with the company for wages, hours and working conditions.[1]

Tucker and members of the committee made demands on the company to meet for the purpose of negotiating a contract. In response to these demands

Uhlenbrock gave a letter to each member of the committee reading as follows:

"You surely must know that our Company has never recognized you personally or any committee as exclusive collective bargaining representative of our production and maintenance employees and has never attempted to negotiate a 'collective bargaining agreement' with you or any committee since the Machinists Union was voted out of our plant on August 14, 1964.

"As you claim in your letter that you and our employees now want to be represented again by the Machinists Union which conducted such a long and fruitless strike at our plant in 1963, and as we sincerely doubt that our employees wish to resume such representation, we have filed a petition with the National Labor Relations Board today asking that they conduct a secret ballot election at our plant following expiration of the certification year on August 14, 1965."

Petition for an election was filed with the Board by the employer on July 23, 1965. This petition was subsequently dismissed by letter of the Acting Regional Director, dated September 16, 1965, for the reason that a complaint was pending against the company. On July 24th approximately thirty of the employees met at the IAM hall and unanimously voted to strike. The employees were on strike from July 26th until September 15th.

On July 26th an unfair labor practice charge was filed on behalf of the committee alleging that the employer "has refused and failed to bargain collectively with *Cincinnati Gasket Shop Committee*, a labor organization, by withdrawing recognition from said organization, in violation of Section 8(a) (5) of the Act." (Emphasis added.) General counsel of the Board caused a complaint

1. The General Counsel agreed that the cards could not "be used in any way in the proceeding as demonstrative of a ma-

jority status af any claiming labor organization."

and notice of hearing to be filed. A hearing was conducted by a trial examiner who recommended that the complaint be dismissed. The Board reversed the trial examiner and found that the committee had been the exclusive bargaining representative of the employees since January 12, 1965, and was guilty of an unfair labor practice by refusing to bargain with the committee. Affirmatively the company was ordered to bargain with the committee on request.

The question before us is whether there is substantial evidence on the record as a whole to support the Board's finding that the petitioner violated Section 8(a) (5) and (1) of the Act by withdrawing recognition from, and refusing to bargain with, the committee. This question turns on whether the petitioner ever recognized the committee as the collective bargaining agent of the employees and whether it ever had an obligation to do so.

■ There is no significance to the alleged or attempted affiliation with IAM. The unfair labor practice charge was filed on behalf of the committee and the Board found that the Company violated the Act in failing to bargain with the committee.

■ As we understand the Board's decision, it rests on the premise that the committee had been recognized as the bargaining agent of the employees long before the attempted affiliation with IAM. The Board's finding is based on implications arising from the acts and conduct of Mr. Uhlenbrock in dealing with the committee and the incident of January 12, 1965, when Mr. Uhlenbrock in answer to a question said he recognized the committee as the bargaining agent of the employees. It is the Board's position that having once recognized the committee as the bargaining agent of the employees, the company was required to continue to bargain with it until the relationship was legally terminated.

The Board, in its conclusions of law, fixes the time at which the committee became the bargaining agent of the employees as January 12, 1965. This was the date of a spontaneous meeting of employees prompted by the demotion of Harry Swinford. Eugene Aday testified that near the close of this meeting

"Mr. Uhlenbrock asked us if anybody had any question, and I raised my hand, and he nodded for me to go ahead, and I stood up and I asked Mr. Uhlenbrock if he, well, the committee was up at the front of the room, and I asked Mr. Uhlenbrock if he recognized the committee as the bargaining agent for all the men in the lunchroom at that time, which everybody was there; Mr. Uhlenbrock says yes; and after that, well I guess I was the last one to ask any questions; and that was about the end of it; we went back to work then."

This was a casual question and a casual answer at a meeting not called by the committee. It was not called for or intended for the purpose of getting recognition of the committee as bargaining agent for the employees present. We think little, if any, significance can be attached to the incident as proof the management recognized the committee as bargaining agent for the employees.

■ We are further of the opinion that no inferences of recognition can be drawn from the formation of the committee and its early meetings with management. If appears that the purpose Mr. Uhlenbrock had when he suggested the formation of the committee was a means of communication between management and the employees. At the early meetings the committee requested some privileges such as permission to have radios in the shop, job bidding, coffee break in the afternoons, etc. Mr. Uhlenbrock granted some of these requests and refused some. There was no give and take or quid pro quo discussion as would characterize collective bargaining. On occasion the meetings were used to announce company policies con-

cerning insurance, perfect attendance awards, Christmas bonus, etc. The company intended the committee to serve as a channel of communication between it and the employees, and treated it as such. This *is significantly different* from recognizing the committee as the exclusive bargaining representative of the employees. If the company had so considered the committee, such action would probably have been a violation of Section 8(a) (2) of the Act, as in those cases where it has been held · that the company dominated an employees' bargaining committee. N.L.R.B. v. Sharples Chemicals, Inc., 209 F.2d 645 (C.A. 6) ; N.L.R.B. v. Chardon Telephone Company, 323 F.2d 563 (C.A. 6) ; N.L. R.B. v. Western Reserve Telephone Company, 323 F.2d 564 (C.A. 6).

 It was not until the meeting of February 2, 1965, that the committee seemed to develop some semblance of a bargaining agent. This was when the committee advised Mr. Uhlenbrock that it was registered with the Labor Department as a shop union under the name "Maintenance and Production Workers Union of Cincinnati Gasket, Packing and Manufacturing, Inc." and that its attorney was preparing a contract. The committee never provided written notice as requested by Uhlenbrock. At the July 13, 1965 meeting, as heretofore stated, the committee presented a contract, prepared by its attorney, providing for recognition and union security.

Uhlenbrock had no answer in nine days, as was requested by the committee, and it was at this point that the committee and employees sought to affiliate with IAM ·and that the company filed a petition with the Board for an election. This was the first effort on the part of the committee to engage in collective bargaining as to terms and conditions of employment. The contract was rejected without the committee ever having been recognized as a bargaining agent. Mr. Uhlenbrock advised the members of the committee on July 23rd by letter that the company had never recognized them individually or as a

committee for collective bargaining on behalf of the employees.

We conclude that there was no substantial evidence, considering the record as a whole to support the findings and conclusions of the Board that the committee was ever accepted or recognized as the bargaining agent of the employees or was ever under any obligation to do so. Section 160(e), Title 29, U.S. C.; Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N.L.R.B. v.· Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284.

The order of the Board will be vacated and its enforcement denied.